## Catholic Order of Foresters v. Jessie Lynch.

### Gen. No. 12,322.

1. FRATERNAL BENEFIT SOCIETY—*when suspension for non-payment of assessment waived.* A suspension for non-payment of assessments provided to take place *ipso facto* by reason of default is waived where the local lodge of the society, acting as the agent of the supreme council, accepts, after such default, the delinquent assessment pursuant to a like course adopted by it with respect to such member in regard to previously defaulted assessments.

2. FRATERNAL BENEFIT SOCIETY—*when provision for ipso facto suspension not waived.* A suspension taking effect *ipso facto* upon the failure of a member to pay an assessment is not so waived by a course of dealing which had previously taken place between the member and the local lodge of the supreme council by which such local lodge had accepted after default the assessments against such member and has not required him to proceed to be reinstated, as provided by the constitution and by-laws of the society, that payment made after death has intervened will operate to restore the rights under the certificate.

Action of assumpsit. Appeal from the Superior Court of Cook County; the Hon. AXEL CHYTRAUS, Judge, presiding. Heard in this court at the March term, 1905. Reversed and remanded. Opinion filed May 7, 1906.

**Statement by the Court.** This is an appeal by the appellant, a fraternal beneficiary society organized under the

laws of the State of Illinois, from a judgment rendered against it by the Superior Court of Cook County in favor of appellee January 7, 1905, for $2,000.

The appellee is the widow of one Thomas H. Lynch, to whom in his lifetime the appellant, defendant below, issued an endowment certificate by which it bound itself to pay to his wife, the appellee, plaintiff below, $2,000 upon satisfactory evidence of the death of said Thomas H. Lynch and upon the surrender of said certificate, *provided*, that said member should be in good standing in said order at the time of his death, and *provided also*, that said certificate should not have been surrendered by said member and another certificate issued to him at his request in accordance with the laws of the order. The certificate recited that the promise and obligation to make this payment were upon condition that the statements made by Lynch in his application for membership, and the statements certified to by him to the medical examiner, were made part of the contract, and upon the condition that he complied thereafter with all the laws, rules and regulations then governing the said Catholic Order of Foresters, or that might thereafter be enacted by the High Court of the Order.

The membership was in Saint Stephen's Court No. 32.

Thomas H. Lynch died on the 10th day of June, 1901, and payment of the amount stipulated in the benefit certificate was demanded of the appellant. The appellant refused to pay. Thereupon the appellee (called hereafter in this opinion the plaintiff) began suit against the appellant (called hereafter defendant) in the Superior Court of Cook County in April, 1902. The declaration alleged the foregoing facts and also that in his lifetime Thomas H. Lynch (hereafter called the insured) kept and performed all the conditions of the certificate and was in good standing in said order at the time of his death, and that satisfactory evidence of the death of said Lynch had been furnished to the defendant.

The defendant pleaded the general issue. A stipulation was afterward entered into, by which it was agreed that

all evidence competent and admissible under proper plead-ings on the part of either party should be admitted under the pleadings as they stood; which stipulation was recog-nized and confirmed by order of court.

On the trial in December, 1904, the plaintiff produced in evidence the benefit certificate sued on, and proved the death of the insured, and that due proof of death had been made to the defendant. She also produced in evidence a pass-book or account-book, presumably given to the insured when becoming a member and kept by him thereafter, to show the various assessments charged against him and the reception of the same by the financial secretary of the local court, which reception is evidenced by the signature of that officer in the extreme righthand column opposite the number of an endowment assessment in the second column from the left of the page, and various other matters in columns between these two.

The headings of the columns run thus: (A half dozen lines of the entries actually existing being also here inserted for illustration.)

| A. D. 189 | ENDOWMENT ASS'M'T | | SPECIAL ASS'M'T | | QUARTERLY DUES | TOTAL AMOUNT | DATE OF PAYM'T | | SIGNATURE OF FINANCIAL SECRETARY |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | NO. OF ASS'M'T | AMOUNT | NO. OF ASS'M'T | AMOUNT | | | MONTH | DAY | |
| Jan. | 137 | 1.12 | 330 | 25 25 | | 1.62 | 9 | 13 | J. J. O'Shaughnessy |
| Feb. | 138 | 1.12 | | | 1.00 | | | | |
| Mar. | 139 | 1.12 | | | | 3.24 | 11 | 8 | J. J. O'Shaughnessy |
| April | 140 | 1.12 | | | | | | | |
| May | 141 | 1.12 | | | | | | | |
| June | 142 | 1.12 | 31 | 25 | 1.00 | 4.61 | 3 | 14 | J. J. O'Shaughnessy |

This account-book has a page preceding the columned memorandum as indicated, as follows:

"ST. STEPHEN'S COURT No. 32.

C. O. F.

July 12, 1896.

Received from Bro. Lynch:
 Initiation Fees.............$1.50
 First Assessment Endowment
  Fund .................. 1.00
 Quarterly Dues............. 1.00
 Certificate of Membership...   .50
 Ass't 136 – Total,.......... 1.12

     $5.12— 2=$3.12
  Secretary J. J. O'Shaughnessy."

The evidence leaves it in dispute between the parties when and for what month assessment 136 was levied, a matter which will be referred to hereafter. It is agreed, however, and is evident from the record, that assessment No. 137 and subsequent numbers were not payable during the months opposite the names of which they are set. By the constitution of the order one regular assessment is made for each month on each member.

The book contains a space for twelve numbers on each page, and the first column which precedes the column for the numbers of the regular assessments is one headed "A. D. 189—", for the names of the months, on the first day of each of which an assessment is by the constitution of the order levied, and during which it is payable. In this column the names of the months are printed. The financial secretary did not note on the first page of the book when or for what months assessment 136 was levied, and when he receipted for assessment 137 he placed that number, the date of payment and his receipting signature in respective vertical columns horizontally opposite the name of the first month in the page—"Jan." Several subsequent numbers—138 and those following—were placed in consecutive lines, and therefore opposite February and the following months consecutively. After the first few entries, the entries were not made on every line, but there appear memo-

randa of assessments numbered from 137 to 193, inclusive, on the book.

As the initiation of the member and the payment of assessment 136 were apparently on July 12, 1896, it is evident that assessment No. 137, which appears to have been paid on September 13, 1896, was not for "January, 1896," opposite which its receipt is credited. The evidence, however, as above noted, leaves it somewhat in doubt-in what month it was levied.

The account-book shows the payment of the various assessments from No. 137 to 193, inclusive, together with certain special assessments and quarterly dues, at various irregular intervals,—sometimes several being paid together.

The final receipt is of assessments 191, 192 and 193, of $1.16 each, and $1.05, being quarterly dues for two quarters—$4.53 in all. The date set down in the book is June 6, 1901, but the testimony of Thomas Callaghan, the financial secretary, who made the memorandum of payment and who signed the receipt, and who was called by the defendant, and the testimony of Edward Morrisey, who was called for the plaintiff, tend to show that the entry was made on June 10, 1901. The insured died June 10, 1901, at 3:30 P. M.

The defendant, in addition to proving the above facts, proved also that the said payment and memorandum of receipt were made under these circumstances. Mr. Morrisey, a cousin of the plaintiff, took $5 to the house of Mr. Callaghan, the financial secretary of St. Stephen's Court, for the credit of the insured on his dues, between one and half past two o'clock in the afternoon, June 10, 1901, and left it with Mrs. Callaghan, her husband not being at home. He arrived home at about 6:30 P. M. on that day, and his wife handed him the $5 bill and told him it was left with her to pay Lynch's assessments. The book must have been left with it, for Callaghan says he then marked $4.53 on it as received. He turned that amount over to one Walsh, the treasurer of St. Stephen's Court, the next evening, June 11th, and gave the forty-seven cents of change back to the party to whom it belonged, as he says, but he cannot tell to whom.

Defendant also produced in evidence the " Constitution, Laws, Rules and Regulations " of the defendant order, calling attention to certain parts of the same insisted on as applying to the claim made in this cause. Some of these excerpts will be referred to in the following opinion.

Admission by stipulation was made by both parties that all assessments accruing during the membership of Thomas Lynch were properly levied by the high court of the defendant order in accordance with the laws of the defendant order, and that notices of said assessments were properly served by the high court upon the members and upon subordinate courts in accordance with the laws of the order, and that under the laws of the order the financial secretary of the local court was required to make a semi-monthly statement to the high court of the members of the local court in good standing, and of those who did not pay their dues within the time required by the order, and that the financial secretary of the court to which Lynch belonged regularly made such reports to the high court, and in said reports made no report that Lynch did not pay assessments within the time required by the laws of the order.

Copies of notices of certain assessments, which assessments and notices were agreed to be of the form of those published in the organ of the order, and of those sent by the high secretary (the secretary of the high court) to the recording secretary of the local court, were also introduced in evidence. At the conclusion of all the evidence the defendant moved for an instruction to the jury to find the issues for the defendant, which motion was denied.

The court gave to the jury three instructions on the law which were asked by the plaintiff, and seven which were asked by the defendant. It refused to give two instructions asked by the plaintiff and five asked by the defendant. The jury returned a verdict for the plaintiff, assessing her damages at $2,000, and after motions for new trial and in arrest of judgment had been denied, the court entered judgment upon the verdict, from which judgment this appeal is taken. The appellant in this court has assigned errors

alleging that the verdict is against the law and the evidence; that the court erred in rulings on the evidence, and erred in the refusal to take the case from the jury by a peremptory instruction for the defendant, and erred in giving each of the instructions given at the request of the plaintiff, and in refusing each one of those refused which was asked by the defendant.

EDMUND S. CUMMINGS, for appellant.

JOHN W. BYAM, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

There is a dispute between appellant and appellee in this case as to what the insured's account or pass-book, produced by the plaintiff, actually shows in relation to the dues and assessments which had been paid by or for the insured before his death.

As we deem it material to know for what assessments the insured was delinquent or in default at various dates between July 12, 1896, and June 10, 1901, we have made a careful analysis of all the evidence and indications in the record which seem to throw light on when assessment No. 193 and preceding assessments respectively were made. The result of our investigation confirms what is claimed by appellant to be also the stipulation of the parties, that assessment No. 191 was levied on April 1, 1901, and was payable between April 1st and April 30th; that assessment No. 192 was levied May 1, 1901, and was payable in May; and that assessment No. 193 was levied June 1, 1901, and payable at any time between June 1st and June 30th, 1901; and that all assessments precedent and subsequent in number to these were of relative dates respectively a month apart. We are aware that this computation makes assessment No. 136, for which (by a change from 135) the pass-book shows a receipt on July 12, 1896, to have been an assessment levied September 1, 1896, and payable at any time before September 30, 1896, and that it makes assessment 137, which is marked as paid Sept. 13, 1896, an assessment levied on

October 1, 1896, and payable between that day and October 30th.

There are difficulties in any way the matter is viewed, but after a careful study of the evidence and indications in the record, both within and without the covers of the pass-book, which indications and evidence it is superfluous to detail here, we are entirely convinced that the difficulties in the way of considering assessments 193, 192 and 191 as those payable in June, May and April, 1901, respectively, and the others as corresponding therewith are not insuperable, while those in the way of considering them otherwise are. Some arrangement might have been made with the new initiate in July, 1896 (such things have happened), whereby his payments were to be considered as paying assessments thereafter to be made. The first page of the pass-book shows evidence of some further rebate not provided for by the published rules of the order. However this may be, we have no hesitation in treating the assessments according to the calendar above indicated.

That the dates of payments are accurately set down in the pass-book seems to be admitted by the parties as to all payments but the last one, where, strangely enough, the discrepancy between June 6, 1901, which the pass-book plainly states to be the date of payment, and June 10, 1901, which Callaghan for the defendant and Morrisey for the plaintiff swear was the date, is not commented on or explained by witnesses or counsel in the lower court or in this court.

Assuming that with the exception of the last payment these dates are accurate, it appears that the

Assessment for September, 1896, was paid July 12, 1896;
Assessment for October, 1896, was paid Sept. 13, 1896;
Assessments for November and December, 1896, were paid Nov. 8, 1896;
Assessments for January, February and March, 1897, were paid March 14, 1897;
Assessment for April, 1897, was paid April 11, 1897;
Assessments for May and June, 1897, were paid June 27, 1897;

Assessments for July and August, 1897, were paid Sept. 13, 1897;

Assessment for September. 1897, was paid Oct. 11, 1897;

Assessments for October, November and December, 1897, were paid—No date given;

Assessment for January, 1898, was paid Feb. 14, 1898;

Assessment for February, 1898, was paid March 28, 1898;

Assessment for March, 1898, was paid April 11, 1898;

Assessment for April, 1898, was paid May 23, 1898;

Assessment for May, 1898, was paid June 13, 1898;

Assessment for June, 1898, was paid August 9, 1898;

Assessments for July, August and September, 1898, were paid October 11, 1898;

Assessments for October, November and December, 1898, were paid December 30, 1898;

Assessments for January and February, 1899, were paid May 2, 1899;

Assessments for March and April, 1899, were paid June 5, 1899;

Assessments for May, June and July, 1899, were paid Sept. 5, 1899;

Assessments for August, September, October and November, 1899, were paid Dec. 30, 1899;

Assessments for December, 1899, and January, February and March, 1900, were paid July 10, 1900;

Assessments for April, May, June and July, 1900, were paid August 23, 1900;

Assessments for August and September, 1900, were paid October 9, 1900;

Assessments for October and November, 1900, were paid December 29, 1900;

Assessment for December, 1900, was paid Jan. 26, 1901;

Assessments for January, February and March, 1901, were paid May 30, 1901;

Assessments for April, May and June, 1901, were paid according to the testimony of witnesses in this case and as apparently understood by both parties thereto, on June 10, 1901; but according to the memorandum receipt in the pass-book, June 6, 1901.

The regular or "endowment" assessments, as they are called in the constitution or rules of the order, were, so to speak, to the extent of one a month, automatic—that is, it was the law of the order (article 5, section 10; art. 10, sec. 1; art. 35, sec. 1), that each month on the first day thereof,

one endowment assessment should be levied and called by the high court, and should be payable on that day. The amount of such monthly assessment on each member was fixed for him also by the constitution of the order according to his age and the amount to be paid to his beneficiary at his death (article 9, sec. 3), and for Lynch was $1.12 up to and including the assessment for December, 1899—No. 175—and $1.16 thereafter.

The high court in case of necessity therefor *could* levy an additional or extra endowment assessment payable on the first day of any given month (article 5, sec. 10), but it is plain from the internal evidence of the pass-book before alluded to, that it did not do so between July 12, 1896, and June 10, 1901. It also levied special assessments (article 5, sec. 10; art. 8, sec. 3) to carry on the business of the high court and conventions, and the special assessments which had accrued and the membership dues to the local court (provided for by article 35, sec. 2) were paid by Lynch, as shown by the pass-book, when he paid the regular monthly endowment assessments.

In view of the regularity and automatic working of these regular monthly assessments, the collection of assessments in advance, which occurred in the present case on Lynch's initiation in July, 1896, and in September, 1896, (but never thereafter) is not very difficult to understand:

The table which we have given of the payments made by the insured is of course very significant in this case. The constitution and rules of the order (article 35, section 1) provide that: "Each endowment assessment levied and called by the high court pursuant to article 10 of these laws shall be due and payable on the part of every regular member of the order at the rates specified in article 9, on the first day of the month for which the assessment is called, *and any such member who fails to pay such endowment assessment before the first day of the next succeeding month, shall, by that fact, stand suspended from the court and order.*"

By art. 35, sec. 2, and sec. 3*a* similar self-operating suspension penalties are affixed to neglect to pay the local .

membership dues or special assessments by the high court during the month in which they are made.

The method of collection of these endowment assessments by the high court is laid down also by the constitution and rules of the order in various provisions. (Article 6, sec. 4c, article 10 entire, article 5a.) It is made by them the duty of the high secretary to publish the calls for the assessments in the official organ of the order, and on the first day of each month to mail a copy of such notice to the secretary of every local or subordinate court in good standing. The notice shall call for the forwarding by each local court to the high treasurer within twenty days of the assessment due from each member. Upon the receipt of such notice the recording secretary of the subordinate court shall notify the financial secretary of said court thereof, who in his turn shall certify the amount due to the treasurer, who shall by the 20th day of the month in which the assessment is called pay to the high treasurer the amount so certified. Any subordinate court which fails thus to pay before the first day of the month next succeeding the month for which the assessment was called and levied *shall by that fact stand suspended.* It is the duty of the financial secretary of the subordinate court to keep an account of the indebtedness and the payments of each member of the court, and accounts with all departments of the order, to receive all moneys payable to the court, and if a member becomes in arrears to notify the recording secretary of the court and the high secretary of the order of the same. After an endowment assessment has been called by the high court he shall determine from his own book the amount due the high court for the assessment, and if he arrives at an amount different from that called for by the high court, to take up and settle the difference with the high court office by comparison of books and accounts.

It will be seen from these provisions that a subordinate court is treated by the high court as liable each month for the full amount of the assessments levied on its members, and is held to pay said assessments in full to the high court

whether they have been paid by its individual members or not. If any individual member, however, defaults in the required payment to the financial secretary during the entire month, his *ipso facto* suspension shall be within twenty-four hours after the end of the month reported by the financial secretary to the high secretary. (Article 36, sec. 6.) This is required under penalty of the deposition of such financial secretary for neglect or failure. (Article 36, sec. 8.) The monthly amount required of the subordinate or local court after this report will of course be decreased by the amount of the assessments of the suspended members. That the local court may not be the ultimate loser by thus being obliged to pay endowment assessments which may never be repaid to them, it is provided that upon his initiation each member shall pay to the financial secretary of his court, " an endowment fee of an amount equal to one endowment assessment as determined from the table of assessment rates for the age, class of risk, and the amount of endowment of the applicant." (Article 23, sec. 24.) And the fund thus created in the treasury of the subordinate or local court shall " constitute the endowment fund of the court, which shall be drawn upon only for the purpose of paying to the high treasurer the endowment assessment levied on the court, but for no other purpose whatever." (Article 27, sec. 1.)

The provisions of the rules concerning reinstatement are stringent. A subordinate court suspended on account of failure to pay the endowment assessments demanded by the high court, may be reinstated within two months upon the payment of all arrears, but in case of failure so to reinstate itself within that time shall be dissolved and its charter forfeited. (Article 10, secs. 6 and 7.)

As to individual members, it is provided (article 37) that every suspended member who is under suspension for non-payments, and who desires reinstatement, must file an application for reinstatement with the recording secretary of his local court within three months next succeeding the date of his suspension; that in said application he must,

over his signature, give the date and cause of suspension, state that he is in good health, and tender a sufficient sum of money to cover, in the event of his reinstatement, all of his indebtedness to the court and order up to and including the date of his reinstatement. To the application must be attached a certificate from a physician that the applicant is in good health, which certificate must bear date within fifteen days of the proposed reinstatement. Every application for reinstatement must be presented and read to the local court, and this must be at the first regular meeting held after the application has been duly filed, but in no case later than at the first regular meeting held after the expiration of the three months next succeeding the date of suspension. If on the reading of the application it is found that the applicant has complied with all the requirements before set forth, and the court is satisfied that the statements in the application as to the health of the applicant are truthful, and that he is at that time in good health, a vote shall be taken, and if two-thirds of the members present vote favorably the applicant shall be declared reinstated to membership, but if less than two-thirds of the members present vote to approve the application, the applicant shall be declared rejected and his name shall be stricken from the membership of the court. If on the reading of the application any member makes the charge that the statements as to the health of the applicant are false, or that the applicant is not at that time in good health, a committee shall be appointed to investigate said charge and report thereon, and if the committee report that the charge is well founded, the name of the applicant shall be stricken from the membership of the court. Every application for reinstatement, after having been finally disposed of, must be certified, together with its disposition, within twenty-four hours after said disposition, under the seal of the local court to the high secretary. Neither the member nor his beneficiaries shall be entitled or have any claim to any pecuniary benefits from the court during the six months next following the date of the reinstatement of the member.

The deposit with the financial secretary of the sum of money to cover the applicant's indebtedness to the court and order, in the event of his reinstatement, shall in no case operate or be construed as a waiver of the suspension of the applicant, and shall be returned to him, his heirs or legal representatives, in the event of his non-reinstatement. (Article 37, sec. 13.)

By another provision (article 36, sec. 4), no moneys in payment of any assessment for a suspended member shall be accepted or received by the financial secretary of any local court during the time of such member's suspension, excepting the deposit required on the application for reinstatement, which shall not be credited to the suspended member's account in any books of the court or order, and any financial secretary who shall disobey this, shall by that fact stand deposed when so declared by a designated officer.

By article 13, sec. 24, "Any subordinate court reinstating a member who has been duly suspended for any cause whatever, without a favorable two-thirds vote of the members present, or without first requiring a certificate of good health from the suspended member, shall be liable to suspension by the high court."

These provisions, taken together, show clearly that in the constitution and legislation for the order an attempt was made to guard by drastic provisions against a state of things which has happened in the present case—that is, a loose and inexact method on the part of the subordinate local courts and their officers of requiring and receiving the periodical dues from the individual members, "seriously jeopardizing", as counsel for appellant truly enough remark, "the life of the society", and on the other side leading members to rely on accustomed indulgences and overlooked delays, to the endangerment of their investment of painfully made savings.

These provisions, however, suggest another and independent consideration, namely, that by the inherent constitution of the order, in all its dealings with the individual members in relation to their assessments and dues, the high

court, the insuring body, representing the entire society, employs as its authorized and responsible agents the subordinate or local courts. These local courts are agents of the high court, which the latter holds to a strict and rigid accountability, and which it penalizes for departure from its laws and rules. In an attempt apparently further to guard itself against unauthorized action of its agents thus constituted, the order provides in its constitution and laws (article 16, sec. 3): "No officer or member of any department or branch of the order shall have any authority, power or right to represent or to act as the agent of the order except in the performance of the duties specifically imposed upon him by these laws, rules and regulations, or by the express direction in writing of the high court or of the respective state or provincial court, and any act or procedure on the part of any such officer or member or of any subordinate court that is contrary to or in conflict with any of the laws, rules or regulations of the order shall be null and void."

The indications, at least, from the evidence in this case are of a persistent failure and neglect on the part of the officers of St. Stephen's Court, which the insured had joined, to observe the laws of the order. There is an express stipulation to the effect that no report was ever made to the high court of the failure of Thomas Lynch to pay the assessments within the time required by the laws of the order. This involves, of course, that there was no such report of his *ipso facto* suspension by such failure. Although, perhaps, it cannot be said that there is any affirmative evidence that the requisite vote upon his reinstatement was not made in the local court at any of the numerous times when, by the rules of the order, he stood *ipso facto* suspended, there is no hint of any such action in the record. Nothing in the evidence or in the theory on which the case was tried suggests it. The fact is apparent that after his initiation in July, 1896, at which Lynch through some arrangement paid an assessment to become due in the following September, and after his first two

Catholic Order of Foresters v. Lynch.

payments subsequent thereto, by which the assessments for October, November and December, 1896, were satisfied, he was in all but one instance in default at the time of his payments. Except in that instance (April 11, 1897) he never paid until a considerable time after he was *ipso facto* suspended according to the rules of the order for a default since his last payment. Therefore, even if the acceptance of each payment should be considered the wiping out of all old scores and a reinstatement, yet his *ipso facto* suspension happened again before the next payment. In the greater number of cases, more than one, and in some cases several assessments were paid, accepted and receipted for together.

The status of the insured in the order at the date of his death, June 10, 1901, is, on account of this situation, a matter about which the parties to this litigation differ widely.

Three propositions are made concerning it. The appellant puts forward the first two of these as alternative; the appellee urges the third.

The first may be thus stated: The certificate sued on expressly makes the promise to pay dependent on the good standing of the insured in the order, and Lynch at the time of his death was not in good standing. Despite the payments which had been accepted from him and credited to him, no reinstatement had ever been made according to to the laws of the order, to which laws he had agreed and which laws he was supposed to know. By them no such reinstatement could be made or waived by any officer or officers of the subordinate local court to which Lynch belonged, except in strict accordance with the methods prescribed by the constitution. In consequence, Lynch stood from February 1, 1897, an *ipso facto* suspended member, whose beneficiaries, by express provision of the constitution, could not receive any benefits from the order until six months after his formal reinstatement, and whose benefit certificate in terms excluded any liability upon it under such circumstances. Under this theory of the situation. there would seem to be a right to the personal representa-

tives of Lynch to recover from the proper persons the
amounts paid by him to them in supposed satisfaction of
assessments since February 1, 1897, but no other recourse
on the order or its officers possible or proper.

The second proposition concerning Lynch's status on
June 10, 1901, is put forward by the appellant as an alter-
native. It is not so drastic in its theory, but leads practi-
cally to the same result in this cause. It is this: Conced-
ing that by virtue of the actions of the officers of the local
or subordinate court—St. Stephen's 32—or, as it might be
reasonably held, of that court itself, formal reinstatement
of Lynch after his first *ipso facto* suspension on February
1, 1897, was waived by the acceptance from him while in
good health, on March 14, 1897, of the January, February
and March assessments together; and conceding also that
after that time payment by him and acceptance by the
court from him while in good health of all that was due to
the order at the time of payment, would prove a sufficient
waiver of formal reinstatement to have replaced the insured
in good standing in the order, no such effect can be given
to the payment made May 30, 1901, which left the insured
still indebted for two assessments, on one of which he was
in such default as already involved suspension. He was
manifestly, then, not in good standing, it is argued, on
June 10, 1901, between one and half past two in the after-
noon, when Edward Morrisey, Mrs. Lynch's cousin, paid
five dollars to Mrs. Callaghan, the wife of the financial
secretary of St. Stephen's Court. Nor was he then in good
health. On the contrary, he was at the point of death—a
condition not known to Mr. or Mrs. Callaghan. But more
than this,—before the financial secretary, at half past six
that afternoon, received and receipted for the money thus
left with a third person for him, the insured was dead. It
was in ignorance of that death that the money was then
received and receipted for by Callaghan. Whatever, then,
in the light of preceding conditions, might have been the
effect as to reinstatement of a payment accepted by the
financial secretary, when the insured was living, although

in bad health, but not reported to other officers of the court until after his death—which is a contingency not necessary to pass upon—there can be no doubt that Lynch died at 3:30 P. M. June 10, 1901, *ipso facto* suspended from the order by default in the payment of overdue assessments, and consequently not a member in good standing. Because he was not at the time of his death in good standing, the membership or benefit certificate on which this suit was brought promised nothing to his beneficiary, and no claim can be founded on it.

The third proposition concerning the status of the insured at the time of his death is, as we understand it, the one insisted on by appellee. It is that at that time Lynch was for two reasons a member in good standing of the order and of the local court, notwithstanding his default, according to the strict rules of the high court, in the prompt payment of assessments. First, because irrespective of any payment on the day of his death, he had been theretofore so treated by the local court and its officers in the collection of dues and assessments, that he had been led reasonably to believe that the *ipso facto* suspension provided for by the laws and constitution of the order had been for him at least absolutely waived; that in all transactions concerning these assessments and their collection the local court was the authorized and exclusive agent of the order and of the high court, and that the latter were estopped, notwithstanding the language of their constitution and rules, from setting up that language against the insured's beneficiaries after thus misleading him by the actions of their agent; that under these circumstances the insured continued to be in good standing in the order until some affirmative action of the high court or of the local court to which he belonged removed him from that position. Secondly, because the money paid for him by Morrisey to Mrs. Callaghan June 10, 1901, paid all arrears; that it was paid to Mr. Callaghan, the financial secretary, when left with his wife, before the insured's death, and that it was taken by the financial secretary and turned over to the treasurer of the local court, and never returned.

Neither the first proposition made by the appellant, nor the third, which is made by the appellee, commends itself to our judgment. The questions involved in them are not free from difficulty, but despite the stringent provisions of the constitution and rules of the order, we are not prepared to hold that after the insured had in good health repeatedly paid to the exclusive and authorized agent of the insuring body the assessments overdue, and they had been received and treated as affecting an annulment of any *ipso facto* suspension that had occurred, and this had been done under liability to heavy penalties therefor on the agent, the suspension nevertheless continued as a matter of fact and law to exist. We think the authorities in this state are against this extreme doctrine. The Metropolitan Safety Fund Accident Association v. Windover, 137 Ill. 417; The R. P. & F. Conductors' M.·Aid & B. Assoc. v. Tucker, 157 Ill. 194.

But, on the other hand, we cannot hold with the appellee that the plain and unambiguous language of the constitution and laws of the order making default *ipso facto* suspend the insured from membership, can be regarded as entirely nugatory at the time of his death, because its full effect on former occasions had been waived in informal or implied reinstatements, rather than enforced in the formal and express ones required by the rules. National Mutual Benefit Assoc. v. Miller, 85 Ky. 88; Schmidt v. Modern Woodmen of America, 84 Wis. 101; Royal Highlanders v. Scoville, 66 Neb. 213.

If the suspension was not self-executing on default, when, if ever, and under what conditions of action did it become so? It would be unreasonable to hold, it seems to us, that for an indefinite time in the future, after a default, in the face of the rules of the order, the insured, whether in good health or bad health, could reinstate himself whether the high court or the local court willed or not, simply because in the past they had received overdue payments without objection or formal action of reinstatement.

We think the true doctrine sustains in effect the second

proposition of the appellant. Lynch was *ipso facto* suspended on and after February 1, 1901. On January 26, 1901, by his payment of the December assessment, and its reception by the local court, in connection with the previous course of business between him and the court, he might perhaps be considered to have secured reinstatement in virtue of a waiver of the more formal action prescribed by the rules. If so, he then had until February 1, 1901, to pay the January assessment. He failed to do so, and before he paid it, with those of February and March, on May 30, 1901, one for April was overdue and one for May was almost so.

By this payment he did not secure reinstatement as a member of the order in good standing. The best that could be said for him was that he took the risk that when he made his next payment, if it covered all arrears, the authorized agent of the insuring body would do what it had apparently been willing to do many times before, that is, waive any prescribed formal action of reinstatement.

But the risk was his—not that of the insuring body, the high court of the order—nor even of the local court. If he wished to be safe, it was for him to observe strictly the rules which gave him a contract right, not to trust to the good nature or loose business methods of those with whom he dealt. And if, before even offering to pay these dues of April and May, he should die, he could not be considered a member in good standing.

This is exactly what happened. He did die before the assessments for April and May were paid or offered to Callaghan, the financial secretary of St. Stephen's Court. There can be no doubt that the trial judge correctly instructed the jury that Mrs. Callaghan was the agent of the party leaving the money with her, and not of the defendant, and that assessments could not be considered paid until delivered to Callaghan himself.

We are forced, therefore, to the conclusion that on the assumption on which this case was tried, namely, that it was half past six o'clock on June 10, 1901, when the April

and May assessments reached Callaghan, Lynch was not a member of the Catholic Order of Foresters in good standing when he died.

If we felt that this assumption spoken of was one which could not be questioned, now or hereafter, because of the apparent agreement thereon of appellant and appellee in this court and in the court below, we should be justified only in reversing the judgment, not in remanding the cause for another trial. And while, for the reason to which we shall briefly advert—we purpose to add a remandment to our order of reversal—we will consider a motion to strike it out of our judgment and allow an immediate appeal, if that is the desire of both parties.

The consideration to which we allude is the entry in the pass-book of June 6, 1901, as the date of the payment of the April, May and June assessments. The evidence of Callaghan and Morrisey in the record to contradict this is unsatifactory and vague. Callaghan said in answer to the court's question, "When?" "It must be on the 10th of June." And Morrisey merely assented to the date placed in the question by counsel.

While the instructions seem to us to leave to the jury questions more properly for the court, we do not think any good result would come from going over them one by one. On the assumption that the last payment credited in the pass-book was June 10th and not June 6th, the case should have been taken from the jury.

We shall reverse the judgment and remand the cause for proceedings not inconsistent with this opinion.

*Reversed and remanded.*